UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EMCO CORPORATION, et al., ) | CASE NO. 5:19-cv-2418 |
| ) | |
| PLAINTIFFS, ) | JUDGE SARA LIOI |
| ) | |
| vs. ) | **MEMORANDUM OPINION** |
| ) | |
| MILLER TRANSFER & RIGGING CO., ) | |
| ) | |
| DEFENDANT. ) | |

**I.  Introduction**

Before the Court are fully-briefed cross-motions for summary judgment: Doc. No. 30, Motion of defendant Miller Transfer & Rigging Co. ("Miller" or "defendant") (as supported by Doc. No. 31, Memorandum of Law; Doc. No. 33, Notice of Filing Exhibits) and Doc. No. 36, Motion of plaintiffs EMCO Corporation ("EMCO USA"), EMCO Maier GmbH ("EMCO Austria"), and Generali Versicherung AG ("Generali") (collectively, "EMCO" or "plaintiffs") (as supported by Doc. No. 39, Memorandum of Law; Doc. No. 38, Declaration (4/19/21) of Nathan T. Williams; Doc. No. 45, Declaration of Alexander Rab).

EMCO filed its opposition to Miller's motion (Doc. No. 49) (as supported by Doc. No. 48, Declaration (5/17/21) of Nathan T. Williams), and Miller filed its reply (Doc. No. 62) (as supported by Doc. No. 63, Declaration (6/7/21) of Eric L. Zalud).

Miller filed its opposition to EMCO's motion (Doc. No. 53) (as supported by Doc. No. 55, Declaration (5/28/21) of Eric L. Zalud), and EMCO filed its reply (Doc. No. 61) (as supported by

Doc. No. 59, Declaration (6/7/21) of Nathan T. Williams; Doc. No. 60, Declaration of Melissa Riordan).

Neither party sought leave to exceed the page limitations for a dispositive motion (*see* Local Rule 7.1(f), setting a 20-page limit for a dispositive motion in a Standard Track case), yet each filed a "Statement of Undisputed Material Facts." Plaintiffs claim their statement of facts (Doc. No. 37) is filed pursuant to a non-existent "Fed. R. Civ. P. 56.1." (*Id*. at 2.[1]) Defendant's fact statement (Doc. No. 32) cites to Fed. R. Civ. P. 56; but, not surprisingly, the citation is non-specific because that rule has no section permitting or requiring the filing of any such statement. In addition, each party's opposition brief was supported by a separate *counter*-statement of undisputed facts. (Doc. No. 47 [EMCO]; Doc. No. 54 [Miller]). Notably, neither party filed "an affidavit certifying compliance with the page limits." (Doc. No. 3, Initial Standing Order at 3.) The practical effect of this self-created procedure is that, without leave, each side has filed materials that, in combination, significantly exceed the limits set by the Court.

Further complicating matters, plaintiffs disregarded this Court's Initial Standing Order, which, in Section VIII (A), prohibits "any material that is submitted by way of incorporation of previously-filed documents." (*Id*.) Here (and merely as *one* example), in its opposition to Miller's motion for summary judgment, EMCO cites it own summary judgment motion and supporting materials (but without pinpoint citations) as authority for its various opposing positions and arguments, thus impermissibly incorporating by reference. (*See* Doc. No. 49 at 6–7 (incorporating seven different documents).) This required the Court not only to put together a jigsaw puzzle

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system, a citation practice recently adopted by this Court despite a different directive in the Initial Standing Order for this case.

(which is why the practice is prohibited) but also to guess at precisely *what* on each cross-referenced document or page was actually being cited by EMCO.

The Court admonishes all counsel for taking such liberties without prior leave. Nonetheless, the Court has done its best to sort out the parties' needlessly complicated treatment of the issue in this case.

For the reasons set forth herein, applying the law relating to the Carmack Amendment, Miller's motion for summary judgment is granted and plaintiffs' motion is denied.

## II. Factual and Procedural Background

This lawsuit involves the international carriage of an industrial machine (a Hyperturn 110-SM2Y-1700) and corresponding parts (collectively, the "Cargo") from the United States to Austria. The shipment was insured by EMCO USA and Generali. EMCO (whose local offices are in Novi, Michigan) claims it hired Miller to pick up the Cargo from a facility in Cuyahoga Falls, Ohio,[2] provide "seaworthy packaging" for the Cargo, and transport the Cargo to the Port of Baltimore, from whence it would be shipped via EMCO's nominated ocean carrier to the Port of Bremerhaven, Germany, and then taken by EMCO's nominated inland carrier to the Cargo's final destination in Hallein, Austria. EMCO claims that, upon its arrival in Hallein, Austria, the Cargo was discovered to be extensively damaged by corrosion.

On October 16, 2019, EMCO filed its complaint against Miller asserting one cause of action for breach of contract of motor carriage under the Carmack Amendment, 49 U.S.C. §

---

[2] The record shows that this machine was originally intended for sale by EMCO to a customer in Cincinnati, Ohio. (Doc. No. 38-4, Declaration of Melissa Riordan at 2 ¶ 4.) When that customer decided not to purchase it, EMCO asked Motch & Eichele Company ("M&E"), one of EMCO's principal distributors in the United States, to store the machine at its facility in Cuyahoga Falls, Ohio until EMCO could locate a new buyer. (*Id*. ¶¶ 5–7.) But EMCO later decided to return the machine to Austria for resale in Europe. (*Id*. ¶ 9.) Thus began this saga.

3

14706(d), due to Miller's alleged "fail[ure] to adequately package the Cargo, which resulted in the Cargo being delivered in damaged condition." (Doc. No. 1, Complaint at 6 ¶ 32.)

For purposes of underlying context, the Court sets forth here relevant facts supported by the record.

On August 31, 2017, Melissa Riordan ("Riordan") at EMCO reached out to Henry (Hank) Willard ("Willard"), the business development manager at Miller (Doc. No. 33-6, Willard Affidavit at 2 ¶ 2), requesting a quote for the "packaging and shipment of a machine in the Cuyahoga Falls, OH area." (Doc. No. 33-6, Ex. A Email chain at 12.) Riordan advised Willard that the machine "will be heading to Bremerhaven to be offloaded and trucked to our company's Austrian HQ in Hallein." (*Id*. at 11.) On September 6, 2017, Riordan further confirmed to Miller[3] as follows:

> Pick-up location would be in Cuyahoga Falls, OH.
>
> The machine would need to be moved to your [Miller's] facility for sea worthy packaging and upon completion of that would be ready to schedule moving from your facility via sea transport to Hallein, Austria.
>
> If you have a trucker that could assist with movement to the best determined port, probably Baltimore, that would be great too.

(*Id*. at 10.)

Willard and Riordan had conversations and exchanged emails, continuing to finalize EMCO's request. On September 26, 2017, Andrea Spalding emailed Miller's formal, final quote to Riordan. (Doc. No. 33-6 at 3 ¶ 8.) The quote encompassed:

- transport of the machine and some separate parts from Cuyahoga Falls, Ohio to Dover, Ohio ($1,585.00 for the machine and $1,456.00 for the parts);

---

[3] Riordan was variously in communication with Willard and one Andrea Spalding, a Miller terminal manager, who responded to Riordan when Willard was "out of the office[.]" (Doc. No. 33-1 at 8.)

4

- crating in Dover, Ohio, which "includes [c]rate, VCI, unloading, reloading, and securing the machine in crate") ($6,582.00 for the large crate [the machine] and $1,768.00 for the small crate [parts]); and

- transport of both crates from Dover, Ohio to Baltimore, Maryland ($3,700.00 for the large crate and $3,482.00 for the small crate).

(Doc. No. 33-6, Ex. B Email chain at 17.) EMCO's expert witness, Carlos Garcia, testified that VCI is an acronym for "vapor corrosion inhibitor" that "gives . . . protection against corrosion." (Doc. No. 33-14, Garcia Deposition at 17–18 (61–62).[4])

The quote stated that it was "governed by rules and regulations in carrier's Tariff MTRR 100 Series and the terms and conditions of the 'Uniform Straight Bill of Lading'." (Doc. No. 33-6 at 17 ¶ 2.) The quote also specified:

> Cargo liability on this shipment/s is released to a value of two dollars and fifty cents ($2.50) per pound, per piece unless carrier is notified prior to pick-up that a value is to be declared. If a value is declared, the amount must be stated on the Bill of Lading. All declared values subject to excess value charges as provided for in carrier's rules and regulations Tariff MTRR 100 Series. If no value is declared on the Bill of Lading, carriers cargo liability is subject to a maximum release value not to exceed the lessor [sic] of $2.50 per pound or $250,000. Used machinery is insured for upset damage only. (For shipments from/to Mexico carrier's cargo insurance applies only to the U.S. portion of the transportation.[)] (see Mexico load provision sheet for terms)[.]

(*Id.* ¶ 3(B).) It is also notable, for purposes of the analysis below, that the formal quote above ended with delivery of the Cargo by Miller in Baltimore, Maryland.

There is no dispute that Riordan initially requested, *inter alia*, a quote on "sea worthy packaging." Miller claims that its very first quote on September 11, 2017 included an "[o]ption to put on machine before going into crate [a] [f]oil bag with vacuum seal if there is [sic] a lot of electronic parts-$1046.00." (Doc. No. 33-1, Ex. 1 Email chain at 6.) Miller claims Riordan

---

[4] Where dposition transcripts are in the four-pages-to-one format, the Court will cite to the ECF page number followed in parentheses by the actual page number.

5

ultimately rejected the foil wrap. (Doc. No. 33-6 at 3 ¶ 7.) But Riordan claims she neither expressly accepted nor expressly rejected the suggestion. (Doc. No. 38-4 at 7 ¶¶ 47–49.) Rather, EMCO asserts that Miller's characterization of the foil wrap as an "option" misled Riordan, arguing:

> Willard never passed that recommendation [to vacuum seal the Cargo in a foil bag] onto [sic] EMCO. [Doc. No. 39 at 8; Doc. No. 37 at 18–19 ¶ 93.] Instead, in its quote, Miller presented that as a mere "option." (*Id*.) Miller admitted that any such recommendation should have been passed on to EMCO. (*Id*.) Had such a recommendation had been [sic] passed onto [sic] EMCO, EMCO would have abided [by] it. (*Id*.; Doc. No. 37 at 20 ¶ 99.)

(Doc. No. 49 at 9 (first and last internal citations modified for form).) Notwithstanding EMCO's current position, it is undisputed that, on September 27, 2017, replying to Spalding's email supplying Miller's "formal quote," Riordan emailed Spalding stating: "Please consider the quote accepted." (Doc. No. 33-6, Ex. C Email chain at 19.) The "formal quote" that was "accepted" did not contain the $1,046.00 price identified as an option for packaging the equipment. But there appears to be no dispute that Clarion *did* apply some form of VCI and inserted some desiccant pouches in the crates.

On or about October 16, 2017, Miller transported the Cargo by truck from M&E in Cuyahoga Falls, Ohio to Clarion Warehouse Company ("Clarion") in Dover, Ohio. (Doc. No. 33-8, Ex. 8 Bills of Lading, Delivery Receipts, and Invoices at 1–7.) There is no suggestion in this record that there was any damage to the Cargo when it arrived at Clarion in Dover, Ohio.

Clarion packaged and crated the Cargo at its facility in Dover, Ohio. On or about November 14, 2017, Miller picked up the now packaged and crated Cargo from Dover, Ohio, and loaded it on trucks for delivery to the consignee, the Ceres Marine Terminal at the Port of Baltimore, Maryland. (Doc. No. 33-9, Ex. 9, Dock Receipts, Bills of Lading, Delivery Receipts at 1–9.) Miller delivered the Cargo to the consignee on November 15, 2017, as indicated by the dock receipt with

6

the notation: "No visible marks." (Doc. No. 33-10, Ex. 10, Affidavit of Elizabeth Kieser[5] at 4.) There is no suggestion in this record that there was any damage to the Cargo when it arrived in Baltimore. There is also no indication that the crates containing the Cargo were opened to inspect for damage. Miller (as well as Clarion) had no further involvement with the Cargo after this delivery in Baltimore.

On or about November 28, 2017, the Cargo was loaded aboard the vessel Drive Green Highway. (Doc. No. 38-3, Declaration of Douglas Wolfe[6] at 2 ¶¶ 3, 5.) Between November 14 and 28, 2017, the Cargo had been stored outdoors at the Ceres Terminal (as is the customary practice unless indoor storage is paid for, which did not happen here). (*Id*. at 2–3 ¶¶ 6–8.) The Cargo arrived at the Port of Bremerhaven, Germany on or about December 15, 2017. (Doc. No. 1 at 4–5 ¶¶ 22–23.) On December 20, 2017, EMCO's nominated inland carrier Interfracht delivered the Cargo to EMCO's facility in Hallein, Austria. (Doc. No. 33-13, Pl. Exp. Report of Carlos Garcia at 4.)

EMCO *claims* that corrosion on the Cargo was discovered almost immediately after its delivery in Hallein, Austria. Whether this assertion is supported by any *admissible* record evidence is addressed, *inter alia*, by a motion to strike filed by Miller. (*See* Doc. No. 50.) Nonetheless, in its unauthorized "Statement of Undisputed Material Facts" (Doc. No. 37), EMCO asserts at paragraph 45: "Two days after the Cargo's arrival [in Hallein, Austria on or about 21–22 December, 2017 (Statement ¶ 44)], on 23 December 2017, the Cargo was inspected and discovered that the Machine had rusted extensively in transit." The immediate citation following this statement is "*Id*. at ¶ 45," which is ineffective and unhelpful, since the prior citation is a string citation, not a single document with paragraphs. In further support of this "factual" assertion

---

[5] Keiser is the Finance and Support Manager for Ceres who provided the relevant business record. (Doc. No. 33-10 at 2 ¶¶ 2–4.)

[6] Douglas Wolfe is the Vice President at Ceres. (Doc. No. 38-3 at 2 ¶ 1.)

7

relating to the timing of the rust discovery, EMCO produced photographs showing rust that it claims were taken shortly after the Cargo arrived in Hallein, Austria. (*See* Doc. No. 45-6 at 2–5; Doc. No. 45-7 at 2–9.) But Miller has also challenged these photographs in the pending motion to strike, arguing that they were not produced before the discovery deadline, and that what was originally produced during discovery was cropped, was not in native format, and contained no identifying metadata. In its opposition to the motion to strike, EMCO *admits* this improper production, but argues it was inadvertent and harmless. (*See* Doc. No. 58.)[7]

Miller asserts that, if the Cargo was rusted, it was because it sat outside in the Austrian winter weather until January 24, 2018, when Alexander Rab of EMCO Austria first opened the crates and examined the Cargo, discovering that it was "all rusty," a fact confirmed on January 31, 2018 by EMCO's insurer (who suggested that EMCO cover the Cargo in a tarp to protect against the weather). (Doc. No. 53 at 9 (quoting Doc. No. 33-15, Rab Deposition at 17 (63) and citing Doc. No. 55-12, Stadlmann Deposition at 7 (21))). When Riordan emailed Willard to report the alleged damage, he reminded her that she had declined the vacuum-sealed foil bag option (Doc. No. 31 at 8–9 (with record citations)), although, again, there appears to be no dispute that Clarion did apply some form of VCI and inserted some desiccant pouches in the crates. On February 22, 2018, representatives from EMCO's insurer inspected the Cargo again and, arguably for the first time, took photographs.

Eventually, in October 2018 (a year before this lawsuit was filed), EMCO sold the Cargo in "as is" condition to an entity in Germany. No one from Miller and/or Clarion was ever invited

---

[7] Given the Court's decision herein that the Carmack Amendment applies, Miller's motion to strike need not be decided (since most of the evidence sought to be stricken would not affect a Carmack determination). Further, the Court recites here EMCO's factual claims regarding the Cargo's condition upon arrival *in Austria* merely to supply context for the overall discussion. As discussed below, the condition of the cargo in Austria is not relevant to a *prima facie* case that EMCO must establish under the Carmack Amendment.

8

to participate in EMCO's inspection of the Cargo or to independently inspect it for damages. (*Id.* at 9.)

## III. Summary Judgment Standard

The standard for evaluation of motions for summary judgment does not change when, as here, there are cross-motions for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quotation marks and citations omitted).

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find

9

by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the party opposing the motion must present evidence supporting the claims asserted by that party. *Banks v. Wolfe Cnty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

**IV.     Discussion**

In its motion for summary judgment and memorandum in support (Doc. No. 31), Miller argues that, as a matter of law, the Carmack Amendment does not apply due to the overseas component of the relevant shipment. Instead, Miller argues that, because it believes the entire

shipment was covered by a "through bill of lading," from Michigan to Austria, the shipment is governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701. At the time this lawsuit was initiated, a claim under COGSA would have been barred by COGSA's one-year statute of limitations).[8]

In the alternative, Miller argues that, even if the Carmack Amendment applies, EMCO is unable to establish a *prima facie* case against Miller. Miller argues further that, even if EMCO were able to establish a *prima facie* case, Miller has a viable statutory defense—that any damage was caused by EMCO's own actions and that Miller was not otherwise negligent.

In its own motion for summary judgment and memorandum in support (Doc. No. 39) (as well as in its opposition to Miller's motion (Doc. No. 49)), EMCO argues that the Carmack Amendment applies because there was no "through bill of lading." EMCO also argues that it can establish the *prima facie* elements of a Carmack Amendment claim, relying on the purported damage to the Cargo discovered when it arrived *in Austria*. EMCO bases this on its assertion that Miller agreed to provide "seaworthy packaging" (subcontracting with Clarion to do so), thereby assuming liability for any failure in that regard.

As set forth below, the Court concludes that Miller is entitled to summary judgment in its favor on EMCO's sole claim under the Carmack Amendment.

A. **The Carmack Amendment**

"The Carmack Amendment, enacted in 1906 as an amendment to the Interstate Commerce Act, 24 Stat. 379, created a national scheme of carrier liability for loss or damage[] to goods transported in interstate commerce." *Exel, Inc. v. S. Refrigerated Transp., Inc.*, 905 F.3d 455, 462

---

[8] COGSA's one-year statute of limitations for cargo claims "begins to run after the goods have been delivered, or on the date the goods should have been delivered[.]" *Dimond Rigging Co., LLC v. BDP Int'l, Inc.*, 914 F.3d 435, 440 (6th Cir. 2019).

(6th Cir. 2018) (quotation marks and citation omitted). The Carmack Amendment "makes carriers liable 'for the full actual loss, damage, or injury . . . caused by' them to property they transport [in interstate commerce], and declares unlawful and void any contract, regulation, tariff, or other attempted means of limiting this liability." *Missouri Pacific R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S. Ct. 1142, 12 L. Ed. 2d 194 (1964) (footnote omitted). "Transportation" is defined broadly to include both "(A) a motor vehicle . . . related to the movement of . . . property . . . ; and (B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of . . . property." 49 U.S.C. § 13102(23); *see Georgia, F.&A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196, 36 S. Ct. 541, 60 L. Ed. 948 (1916) ("the words of the statute are comprehensive enough to embrace responsibility for all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation, which, as defined in the Federal act, includes [packaging]").

The Supreme Court has established a burden-shifting framework for Carmack Amendment claims. "[T]he shipper establishes his prima facie case when he shows delivery [to the initial, i.e., the receiving, carrier] in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability[,]" that is, "that the damage was caused by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Missouri Pacific R. Co.*, 377 U.S. at 137–38 (citations omitted). "If the defendant-carrier meets this burden, it wins. If not, then the shipper prevails based on its establishing the—very low

threshold—prima facie case." *CNA Ins. Co. v. Hyundai Merchant Marine Co., Ltd.*, 747 F.3d 339, 353 (6th Cir. 2014).

While the Carmack Amendment applies to cargo shipped within the United States, it does not apply to international shipments. "[S]hipments from United States ports to ports of foreign countries and vice versa[]" are governed by COGSA. *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 96, 130 S. Ct. 2433, 177 L. Ed. 2d 424 (2010).

In recent years, courts have considered which law is applicable when shipments contain both domestic and international segments. In *Kawasaki*, *supra*, the Supreme Court considered cases involving "through bills of lading covering cargo for the entire course of shipment, beginning in a foreign, overseas country and continuing to a final, inland destination in the United States." *Id*. at 93. The Court held that the Carmack Amendment does not apply to the inland segments of a shipment originating overseas and moving on a single through bill of lading; rather "the terms of the bill govern the parties' rights." *Id*. at 100. The Court expressly noted that it "need not address the instance where goods are received at a point in the United States for export." *Id*. at 103.

In *Hyundai Merchant Marine Co.*, *supra*, the Sixth Circuit closely examined the reasoning in *Kawasaki* and found no basis for limiting its holding to import shipments. Therefore, the Sixth Circuit held that "the rule of *Kawasaki* appears to be that Carmack does not apply to the overseas shipment of goods—import or export—shipped under a single through bill of lading." 747 F.3d at 366.

### B.   Application in Light of the Record

The undisputed facts of record that are relevant to a determination regarding the applicability of the Carmack Amendment show the following.

As set forth in the factual background, *supra*, both EMCO and Miller understood that EMCO's full intent for the Cargo at issue was that

- it would be picked up by Miller from M&E in Cuyahoga Falls, Ohio and transported to Dover, Ohio for "seaworthy packaging";
- it would be transported by Miller from Dover, Ohio to the Ceres Marine Terminal in Baltimore, Maryland;
- at the Port of Baltimore it would be handed over by Miller to a forwarding agent (ROTRA LLC), loaded onto EMCO's nominated ocean vessel (Drive Green Highway), taken to the Port of Bremerhaven, Germany, and discharged to EMCO's nominated carrier (Interfracht Container Overseas Service GmbH) for transport to EMCO Austria in Hallein, Austria.

There are separate bills of lading in the record to cover each leg of the overall trip. (*See* Doc. No. 33-8 [Cuyahoga Falls, Ohio to Dover, Ohio]; Doc. No. 33-9 [Dover to Baltimore, Maryland]; Doc. No. 63-1 [Baltimore to Europe].)[9] "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004) (citation omitted).

Miller relies solely upon the Roco Ocean Bill of Lading under whose terms the Cargo was shipped from Baltimore to Europe. (Doc. No. 63-1, Zalud Declaration, Ex. A at 2–3.[10]) Both Rab and Riordan (employees of EMCO) testified that this bill of lading was intended to cover the entire shipment of the Cargo from EMCO's location in Novi, Michigan (despite the fact that the record

---

[9] These bills of lading contain internal references to the Quote Numbers (*e.g.*, #435212, #437005, #435213) supplied during the email negotiations and in Miller's final, formal quote for carriage of the Cargo (Doc. No. 33-6 at 17)—which is a shorthand way of incorporating into the bills of lading any specific terms set forth in those quotes.

[10] Although Miller cites to its dispositive motion exhibit (Doc. No. 33-21, Ex. 21), the Court cites to a copy of the exhibit contained in a declaration supporting Miller's reply brief, since that copy contains both sides of the bill of lading.

14

does not show that the Cargo was ever in Novi, even if EMCO is) to EMCO Austria's location in Hallein, Austria. (Doc. No. 33-15 at 11 (38); Doc. No. 33-12, Riordan Deposition at 21 (76).)

Without responding to this deposition testimony, EMCO argues, contrary to Miller's position and Rab and Riordan's testimony, that the ocean bill of lading was not a through bill because the face of the bill covers only transport from the Port of Baltimore to EMCO Austria, and does not include any of the transport prior to the Port of Baltimore. (Doc. No. 49 at 13.) EMCO is correct.

In *Reider v. Thompson*, 339 U.S. 113, 70 S. Ct. 499, 94 L. Ed. 698 (1950), the Court considered an overseas import of goods shipped under two non-overlapping bills of lading—one for the sea transport from Buenos Aires, Argentina to New Orleans, Louisiana, and another for the rail transport from New Orleans to Boston, Massachusetts. The Court rejected the lower court's characterization of the railroad bill of lading as "supplemental" to the sea bill of lading, holding instead that "there was no through bill of lading from Buenos Aires to Boston." *Id*. at 117. The Court stated: "If the various parties dealing with this shipment separated the carriage into distinct portions by their contracts, it is not for courts judicially to meld the portions into something they are not." *Id*.; *see also*, *Kawasaki*, 561 U.S. at 102 (distinguishing *Reider* due to its two separate bills of lading as opposed to a single through bill). As the Sixth Circuit explained in its discussion of *Reider*, "the trip comprised two separate journeys, each covered by its own separate bill of lading, the second of which (the overland, rail portion) fell under Carmack, even though the first (overseas) part would not." *Hyundai Merchant Marine Co.*, 747 F.3d at 357.

The instant case is similar to *Reider*, although in reverse. As in *Reider*, the ocean bill of lading relied upon by Miller (Doc. No. 63-1) to attempt to avoid Carmack Amendment application is not a through bill. There is nothing in that bill of lading that even hints at the original pick-up

15

point(s) for the Cargo, *i.e.*, Cuyahoga Falls, Ohio and/or Dover, Ohio.[11] Therefore, this case *is* governed by the Carmack Amendment.

But determining that the Carmack Amendment applies does not end the analysis. In order to establish Miller's liability under the Carmack Amendment, EMCO must "show[] delivery in good condition, arrival in damaged condition, and the amount of damages." *Missouri Pac. R. Co.*, 377 U.S. at 138. But arrival *where* in damaged condition—in Baltimore or in Austria? EMCO says Austria, despite its insistence on applying the Carmack Amendment—a statute establishing "carrier liability for loss or damage[] to goods transported in *interstate* commerce." *Exel, Inc.*, 905 F.3d at 462 (emphasis added).

EMCO relies upon *Reider*'s statement that "[t]he purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider*, 339 U.S. at 119. But, even in *Reider*, that "purpose" of the Amendment is stated in a solely *interstate* shipping context. Here, EMCO, as the shipper, chose to structure the journey in two separate parts. Miller was involved *only* in the first segment, which ended in Baltimore. Therefore, the "arrival in damaged condition" referred to in the case law necessarily means, in this case, arrival in Baltimore in damaged condition. From Miller's perspective, Baltimore was the final destination since that is where Miller delivered the Cargo to a third party hired by EMCO.

EMCO argues that "so long as the evidence establishes, as it does, that the seeds of the Cargo's damage (i.e., improper packing) were sown while the Cargo was in Miller's custody, this

---

[11] EMCO also argues that the ocean bill of lading does not contain the requisite Himalaya Clause and Clause Paramount that would entitle an inland carrier to benefit from the favorable maritime rules in COGSA that limit liability. (*See* Doc. No. 49 at 5–6, 12–14.) Looking at the back side of the bill of lading proves EMCO wrong. (*See* Doc. No. 63-1 at 3 § 1 (Clause Paramount) & § 3 (Himalaya Clause).) But this fact is now irrelevant, since the Court rules that the Carmack Amendment (not COGSA) applies.

is sufficient to establish that the Cargo was damaged 'in transit' for the purposes of the Carmack Amendment." (Doc. No. 39 at 14.) EMCO cites no authority for this proposition—neither any evidence in the record of "improper packing," nor any case law that stands for EMCO's "seeds of damage" argument.

EMCO claims that, due to the alleged failure of the requested "seaworthy packaging," the Cargo was discovered to be damaged when it arrived in Austria. But Carmack liability ends upon the carrier's delivery to the consignee. (Doc. No. 31 at 13 (collecting cases, including *Intech, Inc. v. Consol. Freightways, Inc.*, 836 F.2d 672, 674 (1st Cir. 1987)).) And "delivery" is a question of federal law. *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 213, 51 S. Ct. 453, 75 L. Ed. 983 (1931) (citations omitted). "Since 'delivery' must mean delivery as required by the contract [of carriage], (i.e., the bill of lading and the tariffs), the intention of the parties defines its scope." *Intech, Inc.*, 836 F.2d at 674 (internal quotation marks omitted) (citing *Georgia, F.&A. Ry. Co.*, 241 U.S. at 195).

A "straight bill of lading," such as here, "simply requires delivery of the goods to the consignee." *Id*. at 674. In this case, the consignee for each of the two Cargo crates in the transport from Clarion in Dover, Ohio to Baltimore, Maryland is listed as "Ceres Marine Terminal Dundalk." (Doc. No. 33-9 at 3, 6.) Therefore, under federal law, "delivery" from Miller's perspective occurred in Baltimore, Maryland. Under Carmack, Miller cannot be held responsible for damage allegedly occurring after the Cargo left the Port of Baltimore, which segment was performed under a separate bill of lading that did *not* incorporate Miller. (Doc. No. 31 at 13–14 (collecting cases).)

EMCO cannot have it both ways. If, as EMCO correctly argues, the Carmack Amendment applies because there is no *through* bill of lading from Cuyahoga Falls (or Dover), Ohio to Hallein,

17

Austria, then Miller's liability needed to be established by proof of damage to the Cargo at the time of delivery in Baltimore, Maryland or, at the very least, before the Cargo was loaded on to the ocean-going vessel. That did not happen here, and EMCO does not even allege that it did.[12] Therefore, EMCO has failed to establish the elements of a *prima facie* case under Carmack.

## V. Conclusion

For the reasons set forth herein, the motion for summary judgment filed by Miller Transfer & Rigging Co. (Doc. No. 30) is granted on plaintiffs' sole claim under the Carmack Amendment because, although the Carmack Amendment does apply in this case, EMCO has failed to establish all the elements of its *prima facie* case under the Carmack Amendment.

The motion for summary judgment filed by the plaintiffs (Doc. No. 36) is denied.

**IT IS SO ORDERED**.

Dated: March 24, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[12] There is a brief suggestion in the report of plaintiffs' expert, Carlos Garcia, that damage *may* have occurred from condensation while the Cargo was waiting in Baltimore to be loaded on to the ship. Garcia concludes that the water damage eventually found on the Cargo was caused by fresh, not sea, water. He reaches this conclusion almost exclusively based on the fact that the insurance surveyor's photographs of the Cargo in Austria did not show *white* deposits that would have been left by drying seawater. What is fatal to this "conclusion" is that Garcia admits that the insurance surveyor "did not perform any chemical analysis to the water observed inside both crates[.]" (Doc. No. 33-13 at 17.) Thus, there is no admissible evidence (beyond what amounts to little more than a "hunch") to establish that the Cargo was already damaged by the time it was loaded on to the ship in Baltimore. Even if there were such evidence, that damage allegedly would have occurred *after* Miller's delivery in Baltimore. Even more importantly, EMCO itself makes no argument that the damage occurred in Baltimore, asserting only that "Miller failed to adequately package [the Cargo] in a manner sufficient to withstand the rigors of its *intended voyage*[,]" (Doc. No. 49 at 10 (emphasis added)), suggesting that any damage occurred during the ocean voyage.